**DAVID J. HOLDSWORTH (4052)**
Attorney for Plaintiff
9125 South Monroe Plaza Way, Suite C
Sandy, UT  84070
Telephone (801) 352-7701
Facsimile (801) 567-9960
david_holdsworth@hotmail.com

---

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | | |
|---|---|---|
| JEFFREY R. WINGAD a.k.a. JEFF WINGAD, and EVELYN WILSON a.k.a. EVIE WILSON, | : : : | **FIRST AMENDED COMPLAINT** |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| HARVEST MANAGEMENT SUB, LLC, HOLIDAY RETIREMENT DCA and JOHN DOES I-V, | : : : | Civil No. 2:19-cv-1000-CMR |
| | : | |
| Defendants. | : | Hon. Cecilia M. Romero |

COME NOW the Plaintiffs, Jeffrey R. Wingad a.k.a. Jeff Wingad and

Evelyn Wilson a.k.a. Evie Wilson, complain of Defendants Harvest Management Sub,

LLC, Holiday Retirement DCA (hereinafter "Holiday Retirement") and John Does I-V,

demand trial by jury and allege and as and for causes of action assert as follows:

**JURISDICTION—SUBJECT MATTER AND VENUE**

1.      This action is brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, for allegations of discrimination in employment on the basis of religion and for retaliation in employment.  Jurisdiction is specifically conferred on this Court by 42 U.S.C. § 2000 e (5).  Equitable and other relief are also sought under 42 U.S.C. § 2000 e (5) (g).  Jurisdiction is also based on 28 U.S.C. §§ 1331, 1332 and 42 U.S.C. § 1981, et. seq.

2.      Jurisdiction is proper for this federal district court under federal question and in accordance with Notice of Right to Sue letters, dated September 30, 2019, granting Mr. Wingad and Ms. Wilson the right to file a civil action in federal district court.

3.      Venue in the federal district of Utah is proper in that the Defendant Holiday Retirement does commerce in the State of Utah and most of the actions, events and decisions alleged which give rise to liability occurred in the State of Utah.

## JURISDICTION—PARTIES

4.       Jeffrey R. Wingad a.k.a. Jeff Wingad (hereinafter "Mr. Wingad") is a citizen of the United States and a resident of the State of Utah.

5.       Evelyn Wilson a.k.a. Evie Wilson (hereinafter "Ms. Wilson") is a citizen of the United States and a resident of the State of Utah.

6. Mr. Wingad and Ms. Wilson are married.

7. Harvest Management Sub, LLC, is an employer which does commerce as Holiday Retirement DCA, Winter Park, Florida, (hereinafter "Holiday Retirement"), Holiday Retirement owns or manages over 300 communities in the United States that operate under different names in each community location. Each community has multiple apartments with plus/minus 100 seniors (55 years of age or older) a.k.a. residents per community location, providing meals, housekeeping and other services for such residents. Holiday Retirement does commerce in the State of Utah and operates senior living facilities in Salt Lake County.

8. John Does I-V are individuals or entities whose identities and involvement in the fact pattern of this matter are not yet known or fully appreciated.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

9. Mr. Wingad has exhausted his internal efforts directly with Holiday Retirement and his administrative remedies through EEOC File No. 540-2017-01639C, as evidenced by the EEOC's issuance of a Notice of Right to Sue letter dated September 30, 2019.

10. Ms. Wilson has exhausted his internal efforts directly with Holiday Retirement and his administrative remedies through EEOC File No. 540-2017-

3

01642C, as evidenced by the EEOC's issuance of a Notice of Right to Sue letter dated September 30, 2019.

## STATEMENT OF FACTS

11.     In mid-September 2012, Mr. Wingad and Ms. Wilson were interviewed in Denver, Colorado, by Hal Cook (hereinafter "Cook"), Regional Director, of Holiday Retirement.  On September 22, 2012, Holiday Retirement hired Mr. Wingad and Ms. Wilson to work as a community managing couple.  Holiday Retirement represented that each community manager was to be paid on a salary basis. Human Resources represented that each community manager would be expected to work at least 40 hours per week.  Holiday Retirement provided Mr. Wingad and Ms. Wilson two weeks training in Texas.

12.     At the time of hire and for the next four years, Holiday Retirement typically assigned two manager couples (four people total) to each facility.  The manager couples usually lived on site in apartments so as to provide 24x7 coverage of an on-duty manager couple at each facility.

13.     In October 2012, Holiday Retirement assigned Mr. Wingad and Ms. Wilson to work as the second manager couple at Olympus Ranch Community ("Olympus Ranch") located in Murray, Utah.

14.    At the time, John Soules (hereinafter "Soules") and Shelly Soules were the lead managing couple at the Olympus Ranch.  Mr. and Ms. Soules were and are members of The Church of Jesus Christ of Latter-day Saints ("LDS Church"). Soon after Mr. Wingad and Ms. Wilson began working at Olympus Ranch, the Souleses learned that Mr. Wingad and Ms. Wilson were not members of members of the LDS Church, but affiliated with a non-denominational Christian church.

15.    After learning that Mr. Wingad and Ms. Wilson were not members of the LDS Church, Soules developed a dislike for Mr. Wingad and Ms. Wilson.  Said dislike motivated Soules to treat Mr. Wingad and Ms. Wilson disparately, adversely, to deny their requests for religious accommodation, and to seek to engineer the ending of their employment with Holiday Retirement.

16.    For example, Plaintiffs allege that, soon after Mr. Wingad and Ms. Wilson began working at Olympus Ranch, Soules quickly scheduled Mr. Wingad and Ms. Wilson with excessive work hours that required Mr. Wingad to work 96 hours per week and almost all of the weekends and Ms. Wilson to also work 96 hours per week and almost all of the weekends.  As a result, Mr. Wingad and Ms. Wilson had little "spare time" to attend religious services on Sunday.

17.    As a second example, Plaintiffs allege that, soon after Mr. Wingad and Ms. Wilson began working at Olympus Ranch, Mr. Wingad and Ms. Wilson

requested time off for one-half of the day on Sundays so as to be able to attend

religious services with their church.  Soules refused or failed to provide any

accommodation for Mr. Wingad and Ms. Wilson to enable them to attend religious

services on Sundays, not even allowing them to take one Sunday off per month.

18.    Given Soules' outright refusal to accommodate their desire to

practice their religious faith on Sunday, Mr. Wingad and Ms. Wilson complained to

Holiday Retirement's Regional Director.  Such complaint did not result in any changes,

the scheduling of excessive hours continued and the denial of the couple's request for

religious accommodation continued.

19.    Plaintiffs allege that, after Mr. Wingad and Ms. Wilson

complained to the Regional Director, Soules began a campaign of retaliation against

Mr. Wingad and Ms. Wilson with the purpose of generating a basis upon which

Holiday Retirement could terminate Mr. Wingad's and Ms. Wilson's employment or

which would make their working conditions so intolerable that they would decide to

quit.

20.    In 2013, Holiday Retirement employees and former employees

settled a class action suit against Holiday Retirement for abuse of salaried employees

with salaried positions (such as community managers) and excessive work hours.  As

employees, Mr. Wingad and Ms. Wilson were covered by the class action and were paid settlement amounts along with other employees covered by the class action suit.

21.     However, after the settlement, Holiday Retirement made no changes to the community managers' work schedules and Soules continued to require Mr. Wingad and Ms. Wilson to work approximately 96 hours each per week with no extra compensation or accommodation of any Sundays off to be able to attend religious services.

22.     In March 2013, Soules and Robert Wright (hereinafter "Wright"), Regional Sales Director, who was also a member of The Church of Jesus Christ of Latter-day Saints, had a private meeting with Mr. Wingad and Ms. Wilson.  Plaintiffs allege that the purpose of the meeting was to intimidate Mr. Wingad and Ms. Wilson so as to induce them to resign.  Wright had never observed Mr. Wingad and Ms. Wilson working since he was seldom at Olympus Ranch and he was not a supervisor of Mr. Wingad and Ms. Wilson.  However, Soules had provided Wright with false complaints about Mr. Wingad and Ms. Wilson's work, which had influenced his opinion of Mr. Wingad and Ms. Wilson.  During the intimidating meeting which lasted over an hour, Wright said to Mr. Wingad and Ms. Wilson three times, "I don't think you want your job here very bad".  Wright also said to Mr. Wingad and Ms. Wilson, "While I am not your supervisor, I have had manage red fired", implying that, if Mr.

Wingad and Ms. Wilson did not quit, that he could and would have them fired.  Both Soules and Wright were informing Mr. Wingad and Ms. Wilson in a warning tone that they needed to find other employment.  *See* exhibit of the contemporaneous notes taken the day of this meeting by Mr. Wingad and Ms. Wilson.

23.     Mr. Wingad and Ms. Wilson did not resign, but continued working successfully for Holiday Retirement from 2013 through 2017 and were terminated by Holiday Retirement without a proper notice of termination and without payment of all accrued wages and vacation time, as Holiday Retirement had done with other employees working in the same department and in the same position.

24.     On April 10, 2013, Soules wrote up a false performance review of Mr. Wingad and Ms. Wilson to begin a progressive discipline process so as to be able to permit Holiday Retirement to fire Mr. Wingad and Ms. Wilson.

25.     Mr. Wingad and Ms. Wilson complained about this action, and, when they did so, Holiday Retirement commenced an internal investigation into their complaints.

26.     In conducting such investigation, Holiday Retirment discovered that company records had been changed to make the false performance write up appear to be bona fide and/or justified.

8

27.     The internal investigation also concluded that the performance write up was motivated by religious discrimination against Mr. Wingad and Ms. Wilson.

28.     As a result of such internal investigation, Holiday Retirement did not take disciplinary action against Mr. Wingad and Ms. Wilson.  During this time, residents signed a petition to request that Holiday Retirement allow Mr. Wingad and Ms. Wilson to be able to continue to work at Olympus Ranch, but Holiday Retirement moved Mr. Wingad and Ms. Wilson out of the Olympus Ranch assignment.  Holiday Retirement failed to take prompt and effective remedial action and did not have Mr. Wingad and Ms. Wilson sign off on the incident being dropped or otherwise provide a responsible resolution to Mr. Wingad's and Ms. Wilson's complaints.

29.     Holiday Retirement failed to take any adverse action against Soules for his discrimination and retaliatory actions.

30.     From 2013 through 2017, Mr. Wingad and Ms. Wilson continued to experience continuing violations of retaliation.  For the next four years, from 2013 until 2017, Holiday Retirement had Mr. Wingad and Ms. Wilson work in other facilities and in other locations and states as "Floating Managers" to cover manager vacancies or terminations — Holiday Retirement experienced about 60% manager

turnover per year.  Later, Holiday Retirement changed their position by name only and referred to them as "Flex Managers".

31.     As Mr. Wingad and Ms. Wilson were working at other locations, they were never free from the religious discrimination and the ongoing hostile work environment and retaliation created by Soules.  Since Soules participated on daily regional calls, he knew what communities and dates Mr. Wingad and Ms. Wilson were being scheduled to work.  Frequently, when Mr. Wingad and Ms. Wilson would arrive at a community for an assignment and check in with the onsite managers, the onsite managers would tell Mr. Wingad and Ms. Wilson that Soules had called them privately ahead of time to warn them about Mr. Wingad and Ms. Wilson.  The response Mr. Wingad and Ms. Wilson gave to the onsite managers was to please keep an open mind, observe their work and interaction with residents and form their own opinions.  Almost invariably, at the end of Mr. Wingad and Ms. Wilson's assignments, the onsite managers were complimentary and appreciative for Mr. Wingad and Ms. Wilson's work.

32.     From time to time, Mr. Wingad and Ms. Wilson informed their various supervisors about Soules' ongoing attempts to sabotage their reception at the various assignments.  Nothing changed and his attempts to sabotage their work continued.  Mr. Wingad and Ms. Wilson had the challenge of having to prove

themselves at each new community assignment.  Fortunately, the residents were not

aware of Soules' actions and Mr. Wingad and Ms. Wilson were always well liked and

appreciated by the residents.  Mr. Wingad and Ms. Wilson enjoyed the residents and

found them to be interesting (like opening living history books), a benefit Mr. Wingad

and Ms. Wilson enjoyed, even though they had to put up with the retaliation they were

experiencing.

33.    When the onsite managers and staff experienced Mr. Wingad's

and Ms. Wilson's work ethic, serving residents and staff alike, Mr. Wingad and Ms.

Wilson also gained the trust of the onsite managers.  Mr. Wingad and Ms. Wilson

never had any complaints about their work performance, in spite of the back stabbing

attempts by Soules and, later, by Keith Watkins ("Watkins"), Maintenance Manager at

South Towne Ranch, to undermine Mr. Wingad and Ms. Wilson.

34.    From 2013 to 2017, Soules continued his ongoing campaign of

discrimination and retaliation against Mr. Wingad and Ms. Wilson, causing them to

experience work interference, wage loss, and causing a hostile work environment,

motivated by his original religious discrimination and a desire for Mr. Wingad and Ms.

Wilson to be viewed in a negative light.  Soules' campaign was later joined by Watkins

in a collective effort to bring Mr. Wingad's and Ms. Wilson's employment to an end.

35.     For example, from time to time, Soules and Watkins were able to have assignments for Mr. Wingad and Ms. Wilson cancelled at the last minute. This resulted in wage losses and loss of doing more at higher levels in Holiday Retirement. Mr. Wingad and Ms. Wilson allege such actions constituted a continuing violation.

36.     For example, on January 6, 2015, Mr. Wingad and Ms. Wilson were confirmed for a Flex Manager assignment back at Olympus Ranch, in Murray, Utah, starting January 31, 2015 for a week, which was then canceled by Soules and then Regional Manager, Bryan Culliton (hereinafter "Culliton"). At the time, Mr. Wingad and Ms. Wilson lived about three miles from Olympus Ranch and their assignment was given to the Long heeds, who lived in Boise, Idaho. The Longheeds needed to travel over 500 hundred miles, at additional cost to the company. Holiday Retirement's ongoing failure to deal with the retaliation of Soules, supported by Culliton, resulted in additional wage losses, negative perceptions, and emotional distress for Mr. Wingad and Ms. Wilson.

37.     As another example, Plaintiffs allege that, on October 24, 2016, Ms. Wilson was confirmed for a Flex Manager assignment at the Harrison Regent community in Ogden, Utah, to start on October 27, 2016. Yet, later that same day, Holiday Retirement called Ms. Wilson to cancel the assignment. Later, Ms. Wilson found out that Soules and Watkins had caused the interference by influencing the

Harrison Regent manager, Rose Short (hereinafter "Ms. Short"), with then Regional

Manager, Bryan Culliton, facilitating such interference.  At a later time, Mr. Wingad

asked Ms. Short why the assignment had been cancelled.  Ms. Short informed Mr.

Wingad that Watkins had called her and tried to dissuade Ms. Short from hiring Ms.

Wilson.  With management facilitating this discrimination and retaliation, Holiday

Retirement failed to address the hostile work environment and retaliation, which

caused wage losses for Mr. Wingad and Ms. Wilson.

38.     On seven occasions from 2013 through 2017, Holiday Retirement

assigned Mr. Wingad and Ms. Wilson to work at a facility in Sandy, Utah, named

South Towne Ranch, due to ongoing manager turnover at South Towne Ranch.

39.     Each time Mr. Wingad and Ms. Wilson worked at the South

Towne Ranch, they stabilized the community and increased occupancy substantially.

40.     On two occasions, the residents at the South Towne Ranch

community signed petitions requesting that Mr. Wingad and Ms. Wilson be their

permanent managers because Mr. Wingad and Ms. Wilson genuinely engaged the

seniors and were well liked by the residents.  The residents had no problem with Mr.

Wingad and Ms. Wilson not being LDS and Mr. Wingad and Ms. Wilson had no

problem with the South Towne Ranch residents, most of whom were LDS.  Each time

Mr. Wingad and Ms. Wilson returned, residents would say, "Welcome home".  The

point is that the residents were not participating in religious discrimination and

retaliation against Mr. Wingad and Ms. Wilson.  The discrimination and retaliation was

coming from Holiday Retirement's managers and regional director, Culliton, and the

calculated negative perceptions planned by Soules and joined by Watkins, who was

also LDS, and now collaborating with Soules to apply pressure on Culliton and other

management officials to interfere with job assignments of Mr. Wingad and Ms.

Wilson.  Holiday Retirement and Culliton virtually became parties to the original issues

of religious discrimination and continuous violations of discrimination and retaliation

from 2013 forward that grew to directly result in the wage losses and the loss of

promotion for Mr. Wingad and Ms. Wilson from 2014 continuously through 2018.

       41.     From 2015 to 2017, Mr. Wingad and Ms. Wilson actively applied

three times for the permanent manager positions at South Towne Ranch.  During an

interview with relatively new Regional Director, Bryan Culliton, regarding the present

positions, Culliton stated to Mr. Wingad and Ms. Wilson that he needed to hire LDS

managers for the South Towne Ranch community.  Subsequently, during this time,

Culliton hired seven managers for the position, all of whom were members of the LDS

Church rather than hire Mr. Wingad and Ms. Wilson.  One of the seven LDS managers

Holiday Retirement hired for South Towne Ranch during this time was Soules.  Later,

Holiday Retirement promoted Watkins, Maintenance Manager at South Towne Ranch,

to the position of Community Manager, which was another of the seven LDS managers Culliton hired at South Town Ranch rather than hiring Mr. Wingad and Ms. Wilson.

42.     The earlier five of seven LDS managers hired at South Towne Ranch by Culliton during the same period of time that Mr. Wingad and Ms. Wilson were actively applying for the positions at South Towne Ranch included John Stark (hereinafter "Stark"), Raymond and Beaute Dautel (hereinafter "Dautels"), and Kjell & Gail Jenkins (hereinafter "Jenkinses").

43.     Stark, Dautels, Jenkinses were all fair-minded and ethical LDS people who did not participate in the hostile work environment, or religious discrimination, or retaliation against Mr. Wingad and Ms. Wilson.  Mr. Wingad and Ms. Wilson worked directly with these five LDS Managers at different times while on assignment at South Towne Ranch as Flex Managers, and had a very cooperative and positive working relationship with all five of these LDS Managers, who all knew that Mr. Wingad and Ms. Wilson were not LDS.  In fact, while they were waiting, it was Kjell Jenkins who called to remind Culliton of his appointment to interview Mr. Wingad and Ms. Wilson and had been stood up by Culliton failing to keep his interview appointment.  Culliton failed to keep another interview appointment with Mr. Wingad and Ms. Wilson, and he asked Stark to interview Mr. Wingad and Ms. Wilson for the second manager couple position.  After the interview, Stark, who had

15

been working directly with Mr. Wingad and Ms. Wilson successfully and who knew

that he would be working with them as the second manager couple, recommended that

Mr. Wingad and Ms. Wilson be hired.  Culliton ignored Stark's recommendation,

along with the petitions from the residents that Mr. Wingad and Ms. Wilson be one of

their manager couples and he refused to hire Mr. Wingad and Ms. Wilson for any of

the permanent manager couple positions at South Towne Ranch.

44.    In 2017, Holiday Retirement restructured the community manager

positions, ending the 24x7 manager presence at the communities with no more live-in

manager apartments.  The managers were cut from four per community to two per

community that worked only five days a week for eight hours per day and managers

had to live off-site preferably within 10 miles of the community.  Mr. Wingad and Ms.

Wilson lived eight miles from South Towne Ranch, so, even under the new manager

restructuring, there was no reason for Culliton to not hire Mr. Wingad and Ms. Wilson

for South Towne Ranch, other than the continuous violations of discrimination and

retaliation, which Holiday Retirement failed to address or correct.

45.    The manager restructuring and fifty percent (50%) reduction of

manager staff occurred at the same time Holiday Retirement was demanding a seven

percent 7% increase in resident monthly rent when the cost of living rise was about one

percent (1%) resulting in residents complaining that a seven percent (7%) increase was

not justified.  Mark Prince (hereinafter "Prince"), VP, held another mandatory meeting

with all the managers in 2017 to coach managers how to convince the residents to

accept a seven percent (7%) increase in their monthly rents.  Privately, the managers

complained that they were ashamed to be party to the financial abuse of senior

residents, but no manager dared to object for fear of being fired.  Mr. Wingad and Ms.

Wilson at different times asked Prince and Culliton how to deal with unresolved

resident complaints.  Prince and Culliton separately told them essentially the same

thing, "to ignore them because they will either forget about it or die".  This added

emotional stress to Mr. Wingad and Ms. Wilson who were also trying to be responsive

and serve the residents and customers of Holiday Retirement, and uphold the company

advertising slogan of the "Holiday Touch" that for the most part were just empty

words.

      46.    On March 16, 2017, Mr. Wingad and Ms. Wilson had another

confirmed Flex Manager work assignment at South Towne Ranch, which Watkins

interfered with.  On March 15, 2017, Holiday Retirement assigned Mr. Wingad and

Ms. Wilson to provide Flex Manager coverage at South Towne Ranch starting in the

morning on March 16, 2017.  On that day, Mr. Wingad showed up and punched in

only to find Watkins in the office.  Watkins is also a member of the LDS Church and

previously interfered with Mr. Wingad and Ms. Wilson's other work assignments.

17

Watkins was also working with Soules and collaborating with him since Olympus

Ranch and South Towne Ranch are only seven miles apart.  Due to issues with

Watkins in the past, Mr. Wingad turned on his phone voice recorder to capture the

conversation with Watkins.  Watkins informed Mr. Wingad that his assignment to

South Towne Ranch had been canceled.  Later in the conversation, Watkins admitted

he was the one who had the coverage canceled.

47.     On March 16, 2017, Watkins then sent an e-mail to management

containing a false and derogatory account of Mr. Wingad and Mr. Watkins' exchange

when Mr. Wingad showed up for the work assignment.  Mitch Doblado (hereinafter

"Doblado") was Mr. Wingad and Ms. Wilson's Flex Manager supervisor at that time

and he received Watkins e-mail.  When he received Watkins' e-mail, Doblado called

Mr. Wingad to get his side of the story because he told Mr. Wingad that he was

shocked by what Watkins had written in his e-mail.  Doblado said the e- mail had gone

toi himself, Culliton, Javiera Garcia (hereinafter "Garcia"), Ray Short (hereinafter "Mr.

Short") and others.  Mr. Wingad explained what had happened.  Mr. Wingad has the

audio recording of the exchange that is quite different than what Watkins represented

had happened in his e-mail.  This incident establishes false reporting and slander by

Watkins of Mr. Wingad and Ms. Wilson, intentionally causing work interference,

creating a hostile work environment and causing wage losses that was facilitated by

18

Culliton and Javiera Garcia, officials of Holiday Retirement.  In any event, Mr.

Wingad's assignment was cancelled and he was forced to leave.

48.     When Mr. Wingad and Ms. Wilson complained about this

interference to their supervisor, Doblado, he referred them to Holiday Retirement

employee relations, Maria Miller (hereinafter "Miller"), Director of Employee

Relations.  Doblado apologized to Mr. Wingad and Ms. Wilson stating he was directed

by Miller to withdraw his communications with them as this was now an employee

relations issue.  Doblado sent an e-mail to Mr. Wingad and Ms. Wilson at their

company e-mail and to their personal e-mail on April 3, 2017 that he was directed to

not communicate with them and the matter was now being handled internally by

employee relations.  *See* e-mail dated April 3, 2017.  At that point, Mr. Wingad and

Ms. Wilson felt as if they had just been wrongfully terminated since they could not go

to their supervisor.  Accordingly, on April 5, 2017, both Mr. Wingad and Ms. Wilson

filed complaints with the EEOC.

49.     On April 6, 2017, Mr. Wingad and Ms. Wilson had a phone call

with Miller that began at 4:08 p.m., which was one day after they had filed their EEOC

complaint.  Mr. Wingad and Ms. Wilson were hoping in good faith to resolve the

issues internally.  It was learned on that call that Miller had been involved with

dismissing Soules' false performance write up to make that problem go away.  Miller

immediately took a hostile tone towards Mr. Wingad and Ms. Wilson; it was obvious

to them that she was not working in good faith to resolve the issues and was just

working to have Mr. Wingad and Ms. Wilson go away.  Mr. Wingad and Ms. Wilson

did not trust Maria Miller's intentions or after the call have any hope of dealing with

her in good faith.

        50.    In a further effort by Mr. Wingad and Ms. Wilson to resolve their

complaints internally, they also had reached out to Holiday Retirement legal

department a number of times as instructed in the Employee Handbook for unresolved

employee issues.  Repeated e-mails and phone messages were completely ignored by

the Holiday Retirement legal department, which was no surprise to Mr. Wingad and

Ms. Wilson after they had seen the abusive pattern of Holiday Retirement to ignore

problems or fire employees making complaints.

        51.    As mentioned above, on April 5, 2017, faced with lack of work

assignments and faced with ongoing wage losses, Mr. Wingad and Ms. Wilson filed

EEOC complaints against Holiday Retirement alleging hostile work environment and

retaliation that developed from and was motivated by the original religious

discrimination against Mr. Wingad and Ms. Wilson, which had continued from 2013

through 2017 with no resolution by Holiday Retirement.

52.     Even after filing their EEOC complaint Mr. Wingad and Ms.
Wilson continued to try and resolve issues internally with Holiday Retirement
Employee Relations and with Holiday Retirement Legal Department through
December 2018 with little to no response or were completely ignored to further the
retaliation.  Mr. Wingad and Ms. Wilson allege that Holiday Retirement continued to
retaliate by mishandling the termination of their employment in September 2018.
Eventually, a United States Labor Department agent called Holiday Retirement to
request Holiday Retirement Employee Relations to respond to the legally required
reporting of Mr. Wingad's work and insurance history to the Social Security Office,
which was falsely reported.  After e-mail and phone requests to correct such false
information, Holiday Retirement refused to make the corrections resulting in more
financial damages and more punitive and retaliatory treatment.

53.     Mr. Wingad and Ms. Wilson allege that, after April 2017, Holiday
Retirement continued to retaliate by not giving Mr. Wingad and Ms. Wilson any
further work assignments.  This continued until their official termination on September
30, 2018 which Holiday Retirement mishandled as further intentional retaliation
treatment.

54.     On April 18, 2017, Mark Prince, Vice President, held a mandatory
Flex Manager conference call with over 250 Flex Managers of the roughly over 10,000

Holiday Retirement employees.  Prince informed all the Flex Managers that the Flex

department was ending and that the Regional Directors would be in contact to discuss

payment of severance pay or possible jobs with Holiday Retirement with the Flex

Managers.  This never occurred for Mr. Wingad and Ms. Wilson.  Holiday Retirement

never contacted Mr. Wingad and Ms. Wilson regarding severance pay or other possible

jobs with Holiday Retirement or provided official termination papers.  Holiday

Retirement provided late COBRA insurance notification of insurance resulting in

health insurance coverage being lost and resulting in financial damages.

       55.    After Mr. Wingad and Ms. Wilson filed their EEOC complaints,

Holiday Retirement treated Mr. Wingad and Ms. Wilson differently and more

adversely than it treated other Flex Managers, some of who received severance pay

and/or retained or promoted.  Mr. Wingad and Ms. Wilson never received any

severance pay, and were never contacted to discuss other positions or given official

notice or paperwork of their termination.  Mr Wingad and Ms. Wilson were effectively

fired in retaliation after filing their EEOC complaint on April 5, 2017, and had no more

work assignments through to their official termination on September 30, 2018.  During

that time, Mr. Wingad and Ms. Wilson were still getting and reviewing company e-

mail and logged into the Holiday Retirement University to keep current on their

training.  With no further work assignments, Mr. Wingad and Ms.Wilson filed for

unemployment in the third quarter of 2017.  As another intentional punitive action by

Holiday Retirement, Holiday Retirement challenged their claim for unemployment

insurance benefits.  However, after investigation and hearing by the Utah Department

of Workforce Services, the Department granted full unemployment insurance benefits

to Mr. Wingad and Ms. Wilson who continued to report part time hours worked

reviewing company e-mail and training for Holiday Retirement.

      56.    As required for the continued receipt of unemployment benefits,

Ms. Wilson continued to apply for manager positions within Holiday Retirement but

was rejected and continued searching for and applying for other positions.

      57.    Mr. Wingad was open to apply for Holiday Retirement manager

positions but did not waste his time when he realized Ms. Wilson was being rejected

even by Holiday Retirement Recruiters when they learned of their internal background

and realized they were being blocked.  As a requirement for the continued receipt of

unemployment insurance benefits, Mr. Wingad continued searching and applying for

other jobs.

      58.    On information and belief, Plaintiffs allege that, on or about

September 30, 2018, Holiday Retirement officially terminated their employment.

Holiday Retirement never notified or sent Mr. Wingad and Ms. Wilson an official

notice or proper processing of their termination as they did with other employees in the

same department.  Mr. Wingad and Ms. Wilson learned of the September 30, 2018

termination only during the first week of December 2018 when they received a late

COBRA insurance notice informing them that their health insurance had been

canceled.  This issuance of a late COBRA insurance notice violated COBRA.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### DISCRIMINATION ON THE BASIS OF RELIGION
### AND RETALIATION IN WORK ASSIGNMENTS

59.    Plaintiff incorporates by this reference all allegations listed in

paragraphs 1 through 58 above as if alleged in full herein.

60.    As a direct and proximate result of the actions, decision and

events set forth above, the initial religious discrimination began in early 2013 by

Soules, who altered company records or had others alter the records to make his bogus

performance write up against Mr. Wingad and Ms. Wilson appear valid.  This began a

falsified progressive firing process.  When Mr. Wingad and Ms. Wilson complained

and Holiday Retirement investigated, employee relations' investigation found this

course of action to be motivated by religious discrimination.  During the investigation,

Mr. Wingad and Ms. Wilson produced copies of the records prior to being altered,

Holiday Retirement's negligent resolution was to drop the entire incident and require

Mr. Wingad and Ms. Wilson to work elsewhere in the company.  Holiday Retirement

was negligent by doing nothing to take adverse action against Soules, even in spite of their own internal investigation.

61.     As determined by the Employee Relations Investigator, Soules and, later Watkins, were originally motivated by religious discrimination.  This is supported by the documentary evidence and circumstantial evidence from 2014 to 2017.  Company officials have the responsibility and duty to stop unethical and illegal acts and Holiday Retirement breached its duty by doing nothing to stop such discrimination, and gave its support and encouragement that further empowered the disparate treatment and harassment of Mr. Wingad and Ms. Wilson, directly resulting in their damages.

62.     Holiday Retirement breached its duty to take corrective actions or to enforce their own employee Agreements and contract and enforce their own Employee Handbook violations.  This placed Holiday Retirement in a position of actually becoming a party to the causation of damages and encouraged the discrimination and retaliation to intensify and continued violations from 2013, 2014, 2015, 2016 and 2017 through to Mr. Wingad's and Ms. Wilson's termination on or about September 30, 2018.

63.     Holiday Retirement senior officials colluded, knowingly or unknowingly, with Soules and Watkins, by cooperating directly or indirectly,

facilitating their agenda of religious discrimination and retaliation against Mr. Wingad

and Ms. Wilson.  Bryan Culliton, Regional Director, and Javier Garcia, VP of

Operations, were influenced and manipulated by Soules and Watkins, at other times

prior to and after Mr. Wingad's and Ms. Wilson's work assignment was intentionally

interfered with on March 16, 2017.

        64.    Mr. Wingad was reliant upon company provided health insurance

and to have a timely notification of health insurance coverage being canceled.  As a

direct and proximate result of the above-referenced occurrences and series of events,

Holiday Retirement failed to give timely COBRA insurance notice, in violation of

COBRA, which resulted in increased medical costs and damages.

        65.    Mr. Wingad and Ms. Wilson filed EEOC complaints on April 5,

2017, which was just another interference of their work assignments on March 16,

2017.  Holiday Retirement, with full knowledge, has been intentionally retaliatory by:

(a) its failure to process Mr. Wingad and Ms. Wilson's termination in the same manner

as the other employees in the same department and the same job position that were

terminated; (b) by specifically not paying severance pay and not paying all other

accrued wages and accrued vacation pay with a formal termination process as they did

with others in the same department and the same job position that were terminated; (c)

by reporting false and incomplete work and insurance information to the Social

Security Administration; and (d) by failure to give timely notice of cancellation of insurance of health insurance, as required by COBRA.  Mr. Wingad applied for Medicare.  He listed his work history.  Holiday Retirement did not verify his historical coverage with health insurance, which then generated a monthly penalty at Mr. Winged's cost for Medicare insurance for the rest of his life.

66.     Holiday Retirement breached their duty to deal with John Soules and Keith Watkins or to stop the ongoing hostile work environment that all started with the religious discrimination in 2013 and was further established in 2014, 2015, 2016 and 2017 with additional documents and circumstantial evidence.

**SECOND CAUSE OF ACTION**
**DISCRIMINATION AND RETALIATION**
**IN HIRING AND PROMOTIONS**

67.     Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through 66 above as if alleged in full herein.

68.     As a direct and proximate result of said occurrences or series of events, during the same time from 2015 to 2017 that Mr. Wingad and Ms. Wilson were actively applying for the permanent manager positions, Bryan Culliton, Regional Director, decided to hire seven LDS managers at South Towne Ranch and to not hire Mr. Wingad and Ms. Wilson.  This circumstantial evidence clearly points to discrimination in not hiring Mr. Wingad and Ms. Wilson when they were fully

27

qualified and they had been assigned to South Towne Ranch seven time previously and successfully stabilized the community and increased occupancy.

69.     Mr. Wingad and Ms. Wilson were well liked by the residents at South Towne Ranch.  The residents also wanted Mr. Wingad and Ms. Wilson as permanent managers.  Two times, the residents at South Towne Ranch submitted signed petitions to Resident Relations and directly with Culliton to have Holiday Retirement hire Mr. Wingad and Ms. Wilson as their permanent managers.  During an interview, Culliton told Mr. Wingad and Ms. Wilson that "he had to hire Mormons" for the South Towne Ranch managing couple positions.  Therefore, there was no valid reason for Bryan Culliton to not have hired Mr. Wingad and Ms. Wilson for the manager positions.

70.     This failure to hire  Mr. Wingad and Ms. Wilson for the permanent manager positions directly resulted in their loss of the wages and promotion loss and, since Mr. Wingad and Ms. Wilson had already worked for five years, an additional five years would be likely, and that income loss would be approximately $500,000 for Mr. Wingad and Ms. Wilson collectively.

71.     Holiday Retirement participated directly and indirectly in the causation of a hostile work environment and the financial damages to Mr. Wingad and Ms. Wilson, which Holiday Retirement has failed to resolve.

### THIRD CAUSE OF ACTION
### RETALIATION IN THE FORM
### OF A RETALIATORY TERMINATION

72.     Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through 71 above as if alleged in full herein.

73.     As a direct and proximate result of said occurrences or series of events, and because of Plaintiffs' filing of the EEOC complaints on April 5, 2017, Holiday Retirement also failed to engage in a formal processing of Mr. Wingad's and Ms. Wilson's termination, which also substantiates intentional and punitive treatment of Mr. Wingad and Ms. Wilson than the 200+ other Flex Manager employees.  Holiday Retirement failed to pay Mr. Wingad and Ms. Wilson for all of Mr. Wingad's and Ms. Wilson's accrued labor and vacation pay and any severance pay, as it had with over 200+ other employees that were in the same department and held the same job position when Mr. Wingad and Ms. Wilson were terminated.

### FOURTH CAUSE OF ACTION
### RETALIATION — FAILURE TO PROVIDE CORRECT
### EMPLOYMENT, HEALTH INSURANCE COVERAGE AND PAYROLL
### INFORMATION TO THE SOCIAL SECURITY ADMINISTRATION

74.     Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through 73 above as if alleged in full herein.

75.     As a direct and proximate result of said occurrences or series of events, and because of Plaintiffs' filing of EEOC Complaints on April 5, 2017,

Holiday Retirement provided false and incomplete employee work and health insurance history for Mr. Wingad to the Social Security Administration.

76.     This failure has resulted in the Social Security Administration assessing an ongoing monthly premium penalty for Mr. Wingad's Social Security Medicare Insurance.

## FIFTH CAUSE OF ACTION
## RETALIATION—LATE COBRA NOTICE

77.     Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through 76 above as if alleged in full herein.

78.     Mr. Wingad was reliant upon company provided health insurance and to have a timely notification of health insurance coverage being canceled.  As a direct and proximate result of above-referenced occurrences or series of events, Holiday Retirement failed to give timely COBRA insurance notice, in violation of US labor laws, that resulted in increased medical costs.

## SIXTH CAUSE OF ACTION
## RETALIATION—NEGATIVE REFERENCES

79.     Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through 78 above as if alleged in full herein.

80.     As a direct and proximate result of said occurrences or series of events, Holiday Retirement's failure to deal with Soules and his retaliatory actions

within the company led to the same outside the company.  In 2014, Barbra Luker,

Ph.D., Psychologist, contacted Soules asking for an employment reference on Mr.

Wingad.  Soules did not refer Dr. Luker to Human Resources; instead, he launched

into negative comments and, then, in summary, as Dr. Luker will likely testify, Soules

stated, "You do not want anything to do with Jeff and Evie."  This was an effort to

slander and sabotage Mr. Wingad and Ms. Wilson, not only inside Holiday Retirement,

but outside the company by telling enough people to try and make his false perceptions

as ture and valid.  Holiday Retirement was also negligent in leaving Soules in a

position where he felt safe and empowered and in a position where he could continue

his campaign against Mr. Wingad and Ms. Wilson.

81.     Holiday Retirement breached their duty to deal with John Soules

and Keith Watkins or to stop the ongoing hostile work environment that all started with

the religious discrimination in 2013 and was further established in 2014, 2015, 2016

and 2017 with additional documents and circumstantial evidence.

## DAMAGES

82.     Holiday Retirement's actions and inactions have also caused Mr.

Wingad and Ms. Wilson lost work assignments, lost wages, lost benefits, lost

promotional opportunities and other pecuniary damages.  Such actions and inactions

have also caused Mr. Wingad and Ms. Wilson much emotional pain and suffering.

Over the five years of their employment, Mr. Wingad and Ms. Wilson have reached out for employee assistance and counseling a number of times.

WHEREFORE, Jeffrey Wingad and Evie Wilson pray for judgment against the Defendant(s) individually and/or collectively as follows:

1. For accrued labor and vacation pay and proper termination paperwork;

2. For severance pay;

3. For the lost wages from work interference prior to April 2017 in an amount of not less than $20,000;

4. For the lost wages for the permanent manager position at South Towne Ranch that was improperly denied due to religious discrimination in the amount of not less than $500,000;

5. For lost wages for failure to keep employed from April 2017 to September 30, 2018 in an amount of not less than $60,000;

6. Financial damages from failure to provide correct employment, health insurance and payroll information to the Social Security Administration in the amount of not less than $30,000;

7. Damages from a late COBRA notice on insurance cancellation in an amount of not less than $5,000;

8.      A judgment for emotional pain and suffering, as deemed

        appropriate by the jury and the Court;

9.      A judgment for intentional and punitive damages, as deemed

        appropriate by the jury and the Court;

10.     Reasonable attorney's fees and court costs; and

11.     Any other such relief or compensation deemed just and proper for

        the Plaintiffs to be made whole.

DATED this 11th day of March, 2020.


        _/s/ David J. Holdsworth_____

        David J. Holdsworth
        *Attorney for Plaintiffs*

VERIFICATION

Jeffrey R. Wingad, being first duly sworn, upon his oath, deposes and says that he is the Plaintiff in the above-entitled action, that he has read the foregoing FIRST AMENDED COMPLAINT and understands the contents thereof, and the allegations made therein are true of his own knowledge, except as to those matters alleged on information and belief which he believes to be true.

_/s/ Jeffrey R. Wingad_____
Jeffrey R. Wingad

SUBSCRIBED AND SWORN to before me, a Notary Public, this _____ day of March, 2020.

_____
NOTARY PUBLIC

MY COMMISSION EXPIRES:          RESIDING AT: _____

_____

VERIFICATION

Evelyn Wilson, being first duly sworn, upon her oath, deposes and says that she is the Plaintiff in the above-entitled action, that she has read the foregoing FIRST AMENDED COMPLAINT and understands the contents thereof, and the allegations made therein are true of her own knowledge, except as to those matters alleged on information and belief which she believes to be true.


_/s/ Evelyn Wilson_
Evelyn Wilson


SUBSCRIBED AND SWORN to before me, a Notary Public, this _____ day of March, 2020.


_____
NOTARY PUBLIC

MY COMMISSION EXPIRES:        RESIDING AT: _____

_____